Evans, J.
delivered the opinion of the Court.
The pleadings in this case are the same as in Gaffney’s, Nice R,. 431 ; and it was intended that the verdict should have been the same, but a misapprehension at to what was the finding of the jury in that case has led to the difficulty presented in this. This was one of the questions discussed in the case of the State v. Raines, 3 McC. 533, and is settled by that case, so far as the opinion of the Judge who delivered the opinion of the Court, could settle it. But as there were other important points involved in the case, on which the concurrence of the other members of the Court may have been given, and as it is a question merely of practice, and more especially as the publication of the Statutes at Large, since the decision of that- case, has shed a flood of light on the subject of the homicide of slaves, we have felt at liberty to re-examine the subject, and to inquire whether the reasons given for that decision are such as to require an adherence to it. The principal, if not the only *466 reason assigned for that decision, was, that by the common law, manslaughter is a more comprehensive offence than “ sudden heat and passion.” The Judge says, p. 542, “ although killing in sudden heat and passion is manslaughter, yet manslaughter embraces a killing by any unlawful blow or blows.” The difficulty in the mind of the Judge seemed to have been that manslaughter at the common law was punished by branding in the hand and imprisonment. It was a felony at common law, with the benefit of clergy; but killing a slave in sudden heat and passion was a mere misdemeanor punishable by fine and imprisonment. There is no doubt of the truth of these propositions, but it does not seem to me that the conclusion drawn from them is a necessary one. It is very obvious, from what is said in Gaffney's case, that it had not the .concurrence of the late Judge Earle, whose accurate knowledge of criminal law, and especially of criminal pleading, are well known and appreciated by all who knew him. Words are to be construed in reference to the subject matter to which they are applied. It is undoubtedly true, that manslaughter, when applied to the killing of a freeman, includes every case of homicide without malice, but without justification or excuse. But if it should appear that, by legislative enactment, when applied to the killing of a slave, it has a more restricted but equally certain meaning, then I should conclude that there is nothing in the law which constrains us to say, that the verdict in this case does not authorize us to pass the appropriate sentence of the law on the defendant.
I have very carefully read all the early legislation which has been rendered accessible since the publication of the Statutes at Large. I do not find anything in the legislative history, as exhibited by these Acts, or in any history of the times, which sheds any light on the question how the homicide of a slave was regarded before the year 1690, the date of the earliest extant Act on the subject — whether, as among the Romans, they were regarded (as the Roman slaves all were,) as captives in war and subject in every thing to the will of the master ; or whether, like the ancient Yillians in England, they were considered as reason *467 able beings under the protection of the law. But, however they might have been regarded anterior to any legislation on the subject, I apprehend there can be little doubt as to the nature of the homicide of a slave since the year 1690;
The earliest Act which is extant on the subject of slaves is the Act (as I have before said) of 1690. By the 12th section of that Act (7 Stat. 346,) it is enacted “that if any slaye, by punishment from the owner, for running away or other offence, shall suffer in life or limb, no person shall be liable to the law for the same. But if any one out of wilfulness, wantonness or bloody-mindedness, shall kill a slave, he or she shall, on conviction thereof, suffer three months imprisonment, without bail or mainprize, and also pay £50 to the owner of such slave“ and if any person shall kill a slave stealing in his house or plantation at night, the said slave refusing to submit himself, such person shall not be liable to any damage or action for the same.” In 1712 another Act was passed, for the better 'ordering and governing of slaves. The preamble of that Act recites that “forasmuch as the said negroes and other slaves brought unto the people of this province are of a barbarous, wild and savage nature, and such as render them wholly unqualified to be governed by the laws, customs and practices of this province, but that it is absolutely necessary that such other constitutions, laws and orders should in this province be made and enacted, for the good regulating and ordering of them, as may restrain the disorders, rapine and inhumanity to which they are naturally prone and inclined” — enacts (see 7 Stat. 363, sec. 30,) that “if any negro or other slave, under punishment by his master, or his order, for running away or other crime or misdemeanor towards his said master, shall suffer in life or limb, (which seldom happens) no person whatever shall be liable to any penalty for the same; but if any person shall, in wantonness or only of bloody-mindedness, or cruel intention, violently kill a negro or other slave of his own, he shall pay into the public treasury fifty pounds current monej- — but if he shall kill the slave of another man, he shall pay to the owner of the negro or other slave the full value of the slave, and *468 into the public treasury twenty-five pounds. — but not to be liable to any other punishment or forfeiture for the same.” But if any person shall kill another’^ negro or slave by accident■, he shall not be liable to any penalty but the owner’s action at law. The Act of 1722, (7 Stat. 381,) with the same recital of the barbarous nature, of the slaves, and the necessity of passing laws appropriate to their condition and nature, re-enacts the same as the Statute of 1712, except that the words used as descriptive of the crime are — “out of cruelty, or wilfully shall kill,” &c., he shall pay fifty pounds, and to the owner the full value. The Act of 1735, (7 Stat. 393, sec. 28,) re-enacts the same, except that the descriptive words are “cruelly or wilfully kill,” and the penalty is increased to £500 current money, with the addition that if the person convicted shall be unable to pay, he shall be whipped not exceeding 39 lashes. From these statutes I think we may fairly deduce the conclusion that, by the first two Acts, no homicide of a slave was punished except that which was committed in wantonness or cruelty, which are the characteristics of murder. But as the slaves became more civilized by their intercourse with the whites, not only were the penalties greatly increased, but the offence of killing them was described by words more extensive in their signification, so as to include other killing than what would be denominated murder. Thus by the Act of 1735, every cruel and wilful killing was punished ; whereas, by the Act of 1712, no killing was punishable unless done of wantonness and bloody-mindedness. I think it is also clear that, by these statutes, no punishment was inflicted for any killing whatever, if it occurred in the course of the infliction of punishment for running away, or other crime against the master, and they must be regarded as repealing the common law in relation to killing by accident or negligence.
Thus stood the law prior to therAct[of 1740, (7 Stat. 410.) That Act, reciting that cruelty is unbecoming those who profess themselves Christians, enacts “that if any persoff or persons whosoever shall wilfully murder his own slave, or the slave of any other person, such person shall, on con *469 viction thereof, forfeit and pay the .sum of £700 current money,” and rendered incapable of holding any office or employment within the province. “And if any person shall, on sudden heat and passion, or by undue correction, kill his own slave or the slave of any other person, he shall forfeit and pay the sum of £350 current money.” By this Statute, for the first time, the word murder is used, and a difference made in punishing the different degrees of homicide. Here three distinct offences are enumerated: 1, murder ; 2, killing in sudden heat and passion, which was man-slaughter at common law ; 3, killing by undue correction. What was meant by these latter words is very far from being certain, but I incline to the opinion that they were intended to describe that kind of killing which was exempt from all punishment by the former Statute— by the words “if any negro or other slave, under punishment by his master or his order, for running away or other crime or misdemeanor towards his said master, shall suffer in life or limb.” But lor the purposes of this case it is immaterial whether this be the meaning, or whether they mean a killing without malice in the course of a lawful chastisement by the master or by his order. Thus the law remained, until 1821, when it was declared that “ if any person shall wilfully, deliberately . and maliciously murder any slave, such person on conviction shall suffer death without the benefit of clergy.” And “if any person .shall kill any slave on sudden heat and passion, such person, on conviction, shall be fined in a sum not exceeding five/bun-dred dollars, and imprisoned not exceeeding six months.”
It will be perceived that by this Act the words, undue correction, are omitted, and hence it is supposed that class of killing still remains to be punished under the Act of 174CL I do not think so. It will be found on examining the sev-' eral Acts on this subject, that every Act is a perfect system of itself, and was a repeal of those which had gone before.. The law in relation to the homicide of a slave was not to be gathered in broken fragments from the several Acts on that subject, but every Act embraced the whole subject and operated a repeal of all prior Acts. Besides this,-1 cannot *470 conceive of a case which could now arise by killing by undue or excessive correction, which is not embraced in the Act of 1821.
If the infliction of punishment be with malice, or the wilful and deliberate purpose to kill, it would be murder, as in Harden’s case ; if under the influence of passion excited by the misconduct of the slave, it would be that description of manslaughter described in the Act. by the words ‘sudden heat and passion,’ as was the fact in this case. I come therefore to the conclusion that the legislature intentionally omitted the words ‘undue correction,’ as useless, and intended to include every punishable homicide of a slave under the two classes enumerated in the Act of 1821.
I have no where seen it intimated that an indictment would lie at common law for the homicide of a slave. It is in this State purely a statutory offence, and we must look to the Statute alone to decide. We cannot suppose that when the early Acts made even murder a misdemeanor punishable by a-small fine, they intended to leave other kinds of homicide to be punished as felony at common law. The recital in the preamble of some Acts, of their unfitness to be governed by the laws and usages of the province, forbid any such supposition. The question then presents itself, whether on a conviction for manslaughter, this Court can award punishment under the Act of 1821. It is said in Raines’ case, that killing in sudden heat and passion is manslaughter. It is in fact the most usual manner in which that crime is committed. But the difficulty in that case seems to have been' that there were other modes in which manslaughter might be perpetrated. That is very true when applied to the killing of a free man. But it is very obvious that when applied to a killing of a slave, it must have a more restricted sense. It can only mean a killing in sudden heat and passion. When thus applied, there is no doubt of its meaning ; it has all the certainty which a verdict should posses ; it is neither doubtful nor uncertain (Co. Lit. 227.)
Before the decision of Raines’ case, such a finding by the jury was quite common ; I had been, for many years before, *471 one of the solicitors, and I cannot call to my mind a single case in which a different verdict was rendered, where the conviction was on the second count in the indictment.— The practice ihen was, to insert three counts in the indictment ; one for murder, one for killing in sudden heat and passion, and a third for killing by undue correction.
Upon the whole, after a Very careful examination, I am of opinion there is nothing which precludes us from supporting the verdict in this case, and the motion is dismissed.
Frost, J. and Withers, J. concurred.
Richardson, J. and ONeall, J. also concurred, but are of opinion that until the passage of our Acts, the killing of a slave was murder, manslaughter, or excusable homicide, at common law, according to circumstances, and that now, killing on sudden heat and passion is manslaughter and a felony.

Motion dismissed.